Lisa T. Belenky (CA Bar No. 203225)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, California 94612
T: (510) 844-7107
F:      (510) 844-7150
lbelenky@biologicaldiversity.org

Deborah A. Sivas (CA Bar No. 135446)
Matthew J. Sanders (CA Bar No. 222757)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305-8610
T: (650) 723-0325
F:      (650) 723-4426
dsivas@stanford.edu
matthewjsanders@stanford.edu

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and LOS PADRES FORESTWATCH, <br><br> Plaintiffs, <br><br> vs. <br><br> U.S. BUREAU OF LAND MANAGEMENT; DAVID BERNHARDT, U.S. Secretary of Interior; GABRIEL GARCIA, Field Manager, California Bureau of Land Management, Bakersfield Field Office, <br><br> Defendants. | Civ. No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.    Plaintiffs Center for Biological Diversity and Los Padres ForestWatch (collectively, "Plaintiffs") bring this civil action for declaratory and injunctive relief

against the United States Bureau of Land Management, David Bernhardt, Secretary of the Interior, and Gabriel Garcia, Field Manager of the Bakersfield Field Office (collectively, "BLM"), regarding BLM's approval of E&B Natural Resources Management Corp.'s ("E&B") Application for a Permit to Drill ("APD") to operate a new well (Schlaudeman #354-23) and construct a pipeline on BLM-managed lands in the Russell Ranch Oil Field within the Carrizo Plain National Monument ("Monument") in San Luis Obispo County, California without analyzing the full environmental effects of doing so.  This action arises under, and alleges violations of, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.* and its implementing regulations, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* and its implementing regulations, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*. This is the first oil well and pipeline to be approved in the Carrizo Plain National Monument since the area was established by Presidential proclamation in 2001.

2.     Over the eight (8) years BLM was considering this approval, it reversed course several times.  In 2012, BLM first issued an environmental assessment (DOI-BLM-CA-C060-2012-0040-EA) for the new APD and pipeline, but then in 2016 BLM identified and approved this same well pad for abandonment and restoration of the surrounding area to natural condition, as required by the management plan for the Carrizo Plain National Monument. However, before work began, in 2018 BLM again reversed direction and issued a decision approving the well and pipeline.  On July 19, 2019, the State Director reversed that decision in part and remanded it to the field office for additional environmental review. On May 21, 2020, BLM's Bakersfield Field Office issued a Decision Record again approving E&B's APD and pipeline.  In issuing its 2020 decision, BLM relied upon the 2012 environmental assessment with some revisions (DOI-BLM-CA-C060-2012-0040-EA) ("2020 Rev. EA"). The 2020 Rev. EA failed to analyze many of the significant environmental impacts of drilling

Complaint for Declaratory and Injunctive Relief

and operating a new well within the Monument. Specifically, in the EA, BLM ignored or otherwise glossed over the project's impacts to threatened, endangered, and sensitive species within the Monument, including the California condor, the San Joaquin kit fox, the blunt-nosed leopard lizard, and the giant kangaroo rat, among others, and the attendant habitat fragmentation from the above-ground pipeline. In addition, BLM failed to adequately address impacts to visual resources, despite evidence that the project would be visible from numerous observation points in and around the Monument. BLM also failed to adequately analyze the project's climate-change impacts by downplaying its greenhouse gas ("GHG") emissions and failing to consider the significance of the emissions as direct, indirect, and cumulative impacts. In making this decision BLM has failed to adequately consider and follow the Monument's resource management plan, which mandates that BLM manage the Monument's resources to minimize impacts to wildlife, habitat, visual, climate, and other resources, and to timely abandon and reclaim idle wells. BLM has also failed to take action to ensure timely closure and restoration of other idle wells in the Monument.

3. Plaintiffs will be directly harmed by BLM's decision to approve the APD and pipeline and by BLM's failure to ensure timely closure and restoration of idle wells in the Monument. Plaintiffs ask this Court to find and declare that the approval violated FLPMA and NEPA, and was arbitrary and capricious under the APA, and to vacate the decision. Plaintiffs also ask this court to declare that BLM has violated the Monument Plan by failing to take action to ensure timely closure and restoration of idle wells in the Monument.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346, because defendants are agents of the United States and because Plaintiffs' claims arise under

Complaint for Declaratory and Injunctive Relief

federal law. The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

5. Plaintiffs have exhausted all available administrative remedies to the degree such exhaustion is required. An actual justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgment).

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the federal land that is the subject of this action lies in this judicial district.

7. Assignment to the Western Division of this Court is proper under General Order No. 19-03. I.B.1.a.(1)(b) Non-Removed Cases in Which the United States Is a Defendant.

## PARTIES

8. Plaintiff Center for Biological Diversity ("CBD") is a national non-profit conservation organization with over 72,000 members dedicated to the protection of biodiversity and ecosystems throughout the world. CBD works through science, law, and creative media to secure a future for all species, great and small, hovering on the brink of extinction, with a focus on protecting the lands, waters, and climate that species need to survive. CBD has offices in California and over 17,000 members across the state. CBD actively advocates for the protection of public lands, imperiled species and habitats, including for protection of the lands and resources within the Carrizo Plain National Monument ("Monument") that are at issue in this case. CBD members have specific interests in the affected resources, including the rare plants and imperiled animal species that inhabit the Monument, as well as in the Monument's cultural and visual resources. CBD members also have a specific interest in mitigating greenhouse gas ("GHG") emissions to curb climate-change impacts to the Monument's lands and resources and to preserve its air quality. CBD members have visited and will continue to visit the Monument to view, photograph, and study its

Complaint for Declaratory and Injunctive Relief

resources, including animals such as the California condor, San Joaquin kit fox, blunt-nosed leopard lizard, and giant kangaroo rat, listed plants such as the Kern mallow and Lemmon's jewelflower, and the Monument's unique geological features.

9. Plaintiff Los Padres ForestWatch ("ForestWatch") is a non-profit organization based in Santa Barbara, California with approximately 30,000 members and online supporters. ForestWatch works to protect the Monument and the adjacent Los Padres National Forest with an emphasis on issues pertaining to oil and gas drilling. ForestWatch efforts focus on protecting the rare plants and wildlife that inhabit the Monument and safeguarding the Monument's visual resources and outdoor recreation opportunities. ForestWatch members use the lands in and near the Monument for recreational, scientific, and aesthetic purposes, including for wildlife observation, study, and photography, and have a specific interest in the continued use and enjoyment of these activities within the Monument.

10. Plaintiffs participated in the administrative process, as described in detail below, and have exhausted all available administrative remedies to the degree such exhaustion is required.

11. Plaintiffs have been, are being, and will continue to be adversely affected and irreparably injured by BLM's decision to approve the APD and pipeline without adequate environmental review and without complying with the terms of the Monument's resource management plan (the 2010 Monument Plan), or the Monument Proclamation, Proclamation No. 7393, 66 Fed. Reg. 7339 (Jan. 22, 2001). The interests of Plaintiffs' members described above will be injured not only by the noise, pollution, and adverse impacts to wildlife and plants associated with construction, operation, and maintenance of the new well and pipeline, but also by direct and indirect GHG emissions of carbon dioxide and its equivalents, including methane and nitrous oxide, which scientific evidence establishes contribute to increased temperatures and other climate-change impacts. BLM's approval of the APD and

5

Complaint for Declaratory and Injunctive Relief

pipeline without adequate environmental review as NEPA mandates will inhibit Plaintiffs' and their members' ability to observe, study, and enjoy the Monument's unique resources and, thus, will cause them to suffer actual injury in fact that is concrete and particularized. BLM's failure to ensure timely closure and restoration of idle wells in the Monument and termination of idle leases also impacts Plaintiffs' and their members' ability to observe, study and enjoy the Monument resources and causes harm to their interests in and ability to enjoy the scientific, visual and recreation values of the Monument.

12.    Plaintiffs' injuries described above would be redressed by the relief sought herein.  Plaintiffs have no adequate remedy at law.  Plaintiffs have exhausted all available administrative remedies to the degree such exhaustion is required.

13.    Defendant United States Bureau of Land Management ("BLM") is an administrative agency within the United States Department of the Interior responsible for managing the public lands and resources within the Monument.  BLM's stated mission is to sustain the health, productivity, and diversity of America's public lands for the use and enjoyment of present and future generations.

14.    Defendant David Bernhardt is the Secretary of the Interior and is sued in his official capacity.  Mr. Bernhardt is the official ultimately responsible under federal law for ensuring that BLM's actions and management decisions comply with applicable laws and regulations.

15.    Defendant Gabriel Garcia is the Field Manager of BLM's Bakersfield Field Office and is sued in his official capacity.

## LEGAL BACKGROUND

**Antiquities Act, Proclamation, and Monument Plan**

16.    Section 2 of the Antiquities Act vests in the President discretion to "declare by public proclamation historic landmarks, historic and prehistoric structures,

Complaint for Declaratory and Injunctive Relief

and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." 16 U.S.C. § 431.

17. President Clinton established the Monument by Presidential Proclamation on January 17, 2001, to protect its unique biological, archeological, historical, paleontological, and geological resources. Proclamation No. 7393, 66 Fed. Reg. 7339 (Jan. 22, 2001). The Proclamation directs the Secretary of the Interior, through BLM, to "prepare a management plan that addresses the actions . . . necessary to protect the objects identified" in the Proclamation. *Id*. at 7341.

18. On April 10, 2010, BLM adopted the Carrizo Plain National Monument Approved Resource Management Plan and Record of Decision ("Monument Plan"). The Monument Plan establishes goals, objectives, and allowable uses to protect the Monument's unique resources. To comply with the Monument Plan, BLM is required to consider and follow the plan's objectives and actions.

19. In approving any new projects and activities within the Monument, BLM must comply with the terms of the Proclamation and Monument Plan.

**The Federal Land Policy & Management Act of 1976**

20. The Federal Land Policy and Management Act ("FLPMA") is a comprehensive statute designed to ensure that BLM-administered public lands are "managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

21. FLPMA requires BLM, with public participation, to develop and maintain land-use plans for the use of the public lands that it manages. *Id.* § 1712(a).

22. FLMPA's implementing regulations require BLM to prepare and maintain a resource management plan for the Monument. *See* 43 C.F.R. § 1610.1(b). Once a resource management plan is developed, FLPMA's implementing regulations

Complaint for Declaratory and Injunctive Relief

mandate that "[a]ll future resource management authorizations and actions . . . conform to the approved plan." *Id.* § 1610.5-3(a).

23.   Before approving any actions that may have a significant impact on the environment, BLM also must comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*.

**National Environmental Policy Act (NEPA)**

24.   NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted NEPA to "prevent or eliminate damage to the environment" by requiring federal agencies to consider the environmental impacts of their proposed actions.  42 U.S.C. § 4321.

25.   To comply with NEPA, the responsible federal agency must prepare and make available to the public an environmental impact statement ("EIS") that considers the effects of each "major Federal action[] significantly affecting the quality of the human environment." *Id.* § 4332(2)(C).  To determine whether a proposed action's impacts are significant enough to warrant preparation of an EIS, the agency may prepare an EA.  *See* 40 C.F.R. § 1501.4.

26.   The EA must explain the need for the proposed action, alternatives to the proposed action, and the environmental impacts of the proposed action and alternatives.  *Id.* § 1508.9.  The agency must also identify and consider mitigation measures to address the impacts.  *Id.* §§ 1502.14(f), 1502.16(h).

27.   The EA must take a "hard look" at the proposed action's impacts.  If the agency determines that the impacts are not significant, it must provide a "convincing statement of reasons" and issue a FONSI.  *Id.* §§ 1501.4, 1508.9, 1508.13. If impacts may be significant, an EIS should be prepared.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

28.   NEPA requires agencies to consider and disclose to the public a proposed action's cumulative impacts.  42 U.S.C. § 4332(2).  The term "cumulative impact"

Complaint for Declaratory and Injunctive Relief

means "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

29.   NEPA's implementing regulations require agencies to "insure the professional integrity, including scientific integrity" of their environmental analysis. *Id.* § 1502.24. If information pertinent to the proposed action's adverse impacts is incomplete or unavailable, the agency must "provide a statement that such information is incomplete or unavailable" and explain "the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts." *Id.* § 1502.22(b)(1).

**Administrative Procedure Act (APA)**

30.   An agency's compliance with FLPMA and NEPA is subject to review under the APA. 5 U.S.C. §§ 701 *et seq.*

31.   Under the APA, a reviewing court shall hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

FACTUAL BACKGROUND

**Carrizo Plain National Monument**

32.   On January 17, 2001, President William J. Clinton established the Carrizo Plain National Monument ("Monument") by Presidential Proclamation to protect the Monument's exceptional scientific and historic objects. Proclamation No. 7393, 66 Fed. Reg. 7739 (Jan. 22, 2001). The Monument encompasses approximately 204,107 acres of BLM-managed federal land and has been described as "California's Serengeti." A BLM map of the Monument is reproduced below:

Complaint for Declaratory and Injunctive Relief

*Monument Plan at Map 2-2 (Physical Features and Planning Area Boundary).*

33.    The Proclamation describes the Monument, which is bisected by the San Andreas Fault zone, as the "largest undeveloped remnant" of the San Joaquin Valley ecosystem.  Proclamation No. 7393, 66 Fed. Reg. 7739.  The Monument provides "crucial habitat for the long-term conservation of the many endemic plant and animal species that still inhabit the area." *Id.*  Specifically, the Monument supports and provides refuge for endangered, threatened, and rare animal species, including the San Joaquin kit fox, the California condor, the blunt-nosed leopard lizard, the giant kangaroo rat, the San Joaquin antelope squirrel, the longhorn fairy shrimp, and the vernal pool fairy shrimp.  *Id.*  The Monument also supports rare and sensitive plant species, including the California jewelflower, the Hoover's woolly-star, the San-

Complaint for Declaratory and Injunctive Relief

Joaquin woolly-threads, the pale-yellow layia, the forked fiddleneck, the Carrizo peppergrass, the Lost Hills saltbush, the Temblor buckwheat, the recurved larkspur, and the Munz's tidy-tips. *Id.* Further, the Monument is home to Soda Lake, the largest remaining natural alkali wetland in southern California and the only closed basin (which does not drain into a river or the ocean) within the coastal mountains. Soda Lake supports certain plant and animal species, including migratory birds, and, during winter, it fills with water and thousands of lesser sandhill cranes, long-billed curlews, and mountain plovers flock to the area. *Id.* The Monument is perhaps most well-known for its stunning super-bloom wildflower displays visited by tens of thousands of people in the springtime.

34.     On April 10, 2010, BLM adopted the Carrizo Plain National Monument Approved Resource Management Plan and Record of Decision ("Monument Plan"). The Monument Plan establishes goals, objectives, and allowable uses to protect the Monument's unique resources. To comply with the Monument Plan, BLM is required to consider and follow the plan's objectives and actions.

35.     With respect to mineral rights, the Monument Plan provides, "The Monument Proclamation withdraws the Monument from future leasing. However, existing leases are considered to be valid existing rights and must be managed under the terms and conditions of those leases." Monument Plan, at II-3.

36.     The Monument Plan establishes a goal to "[m]anage the exploration, development, and abandonment of oil and gas on existing federal leases in a manner that protects" the Monument's unique objects, as specified in the Proclamation. *Id.* at II-72. The Monument Plan includes several objectives and actions that are intended to effectuate that goal, as follows:

> Objective MNL-4(I*): Manage leases to *minimize fragmentation of habitat* (including removal of redundant roads and unused pipelines, storage tanks, and other infrastructure).

11

Complaint for Declaratory and Injunctive Relief

Objective MNL-7(P): Manage existing leases with additional requirements (above federal standards) to protect Monument Resources.

Action MNL-3(S): As leases stop producing, process termination or expiration in a *timely manner*.

Action MNL-4(I\*): Conduct *annual* surface inspection on all leases within the [Monument] to identify and remediate any hazards or impacts to Monument resources such as threatened and endangered species and cultural resources.

Action MNL-6(I\*): Manage the existing oil producing acreage on the southern side of the Caliente Range to maintain ecological processes and to assure prompt lease restoration upon final abandonment of the last well

Action MNL-8(I\*): Design roads, well pads, and facilities to *impact and fragment the least acreage practical*. New facilities will be designed to maintain natural drainage and runoff patterns, reduce visual impacts, and reduce hazards to wildlife, especially California condors. Encourage operators to modify existing facilities when necessary to achieve the above objectives, and consider providing BLM funds to assist if requiring modifications is beyond BLM's authority on existing leases.

Action MNL-10(I\*): Wells that are not commercially developed must be properly plugged and abandoned and reclaimed to natural contours and revegetated as soon as appropriate; that is, restoration methods will consider timing of planting, acceptable species and evaluation criteria, and will be tailored to area-specific resource conditions and be compatible with the Monument Proclamation.

Action MNL-20(S): Prioritize termination of all idle leases in the Monument.

*Id.* at II-73 to II-75 (emphases added). BLM must manage existing leases to ensure that wells and the underlying leased lands are timely restored to their natural function and conditions. *Id.* at II-73 (Objective MNL-2(I\*)). Specifically, "[s]hut-in or abandoned wells will be inventoried and evaluated for final plugging and restoration prioritization," and leases that cease production will be terminated in a timely manner.

12

Complaint for Declaratory and Injunctive Relief

*Id.* (Actions MNL-2(I), MNL-3(S)).  In addition, BLM must "[p]rioritize termination of all idle leases in the Monument."  *Id.* at II-75 (Action MNL-20(S)).

37.   The Monument Plan addresses air quality within the Monument and requires BLM to "[c]onsider impacts of climate change on Monument resources and evaluate the contribution of management actions and program activities on climate change."  Monument Plan, at II-34 (Action AIR-2(I*)).  At the time BLM adopted the Monument Plan, it acknowledged that because climate-change information and models were in their infancy regarding site-specific impacts within the Monument, it would need to use adaptive management to address and mitigate climate-change impacts on the Monument's objects and to minimize contributions to climate change from Monument activities—namely, oil and gas activities on existing leases.  *Id.* at III-37-38.

## PROCEDURAL BACKGROUND

**APD and Pipeline Proposal, Abandoned Well Reclamation Project, and BLM's Reversal**

38.   Prior to 1950, a well pad and access road were constructed in the foothills of the Caliente Mountains. One well (formally called RRU 77-23) operated from this pad for a few years until the well was idled in the 1960s. The well has not produced any oil or gas since then.

39.   In 2012, following completion of the Monument Plan for the Monument, BLM prepared and released an Environmental Assessment (DOI-BLM-CA-C060-2012-0040-EA) ("2012 EA") for a new well (Schlaudeman 354-23) and pipeline project on the old RRU 77-23 well pad.  On April 23, 2012, Plaintiffs submitted comments on the EA, which asked BLM to revise the EA, and to consider preparing an Environmental Impact Statement ("EIS"), to ensure (i) that the proposed action's environmental impacts were avoided or otherwise reduced to levels below the

Complaint for Declaratory and Injunctive Relief

significance threshold, and (ii) that the proposed action was consistent with BLM's Monument Plan.

40.    On September 27, 2013, BLM sent to E&B a letter identifying twelve (12) wells in the Monument[1] that had been idle for more than 25 years, and requiring E&B to return the wells to production or to submit a Sundry Notice to plug and abandon the wells by April 1, 2014, and to complete all abandonment work within one year from the date BLM approved any Sundry Notice.  During a November 21, 2013 meeting with BLM and in a follow-up letter dated that same day, E&B provided recommendations regarding the twelve (12) idle wells, which included perforating and returning certain wells to production and partially or fully abandoning and reclaiming others.  E&B neither returned the wells to production nor submitted a Sundry Notice by April 1, 2014.

41.    On March 11, 2015, E&B submitted to BLM a Sundry Notice to plug and abandon the old RRU 77-23 well and RRU 46-25.  In the Sundry Notice, E&B agreed to perform post-abandonment surface restoration on the pad at issue in this case, consistent with the Monument Plan.

42.    In response to the Sundry Notice, on March 22, 2016, BLM issued a scoping notice that invited public comments.  The scoping notice described the well abandonment as follows: "The well pad site restoration will include the ripping of [the] well pad[] and [its] associated access road[] to a depth of approximately 12 inches, seeding the site with BLM approved seed mix, and fencing the site to exclude vehicles and to allow for proper restoration."

43.    BLM prepared an EA for the well-pad abandonment and reclamation. On April 20, 2016, ForestWatch submitted comments in support of the project to abandon and remediate the well pad, and BLM approved the project on July 1, 2016.

---

[1] The 12 wells listed in that letter are: RRU 24-25, RRU 54-25, RRU 11-25, RRU 43-25, RRU 44-25, RRU 32-25, RRU 46-25, RRU 21-25, RRU 35-25, RRU 77-23, RRU 922-25, and RRU 111-25.

Complaint for Declaratory and Injunctive Relief

The comprehensive abandonment project was consistent with the Monument Plan. *See* Monument Plan, at II-73 to II-75 (Actions MNL-3(S), MNL-6(I\*), MNL-10(I\*), MNL-20(S)). The well pad was never abandoned, reclaimed, or restored to natural conditions.

44. In a surprising reversal, BLM and E&B retreated from their commitment to abandon and reclaim the RRU 77-23 well pad, the related infrastructure, and the surrounding area to its natural condition. Instead, on March 16, 2018, BLM issued a Decision Record, EA, and Finding of No Significant Impact ("FONSI") approving E&B's APD for the new Schlaudeman #354-23 well (on the same well pad as RRU 77-23) and a pipeline.

45. In response, on April 18, 2018, Plaintiffs requested California State Director Review ("SDR") of BLM's decision and that the decision be stayed pending review. The State Director issued its decision on July 12, 2019, which concluded that BLM's EA and FONSI approving the APD failed to adequately and fully consider under NEPA the proposed action's GHG emissions associated with the well and the related climate-change impacts, as well as the project's impacts to threatened and endangered species. The State Director stayed BLM's Decision Record and remanded to BLM the EA and FONSI approving the APD.

46. On May 21, 2020, BLM issued a new Decision Record approving the APD with a revised EA and FONSI. BLM did not provide to interested parties the opportunity to comment on the revised EA.

47. BLM's revised EA included an expanded identification of GHG emissions. In particular, BLM estimated the proposed action's annual direct and indirect GHG emissions for the production, transport, and end use of crude oil to be 5,278 metric tons of carbon dioxide equivalent ("MTCO2e"). 2020 EA at 28.[2]

---

[2] The page references in all citations to the 2020 Rev. EA reflect PDF page numbers because the EA was not paginated.

Complaint for Declaratory and Injunctive Relief

Nevertheless, BLM dismissed the significance of these GHG emissions and failed to address climate change in its cumulative-effects analysis "because the [climate-change] phenomenon is innately a result of cumulative impacts and is difficult to quantify." *Id.* at 30. BLM stated that it used an indirect-GHG-emissions analysis to "serve[] as a proxy for assessing potential for climate change effects and climate related cumulative impacts," and concluded that the proposed action's annual direct and indirect emissions are the "equivalent of operating 13 semi-trucks 5 days a week for a year." *Id.* BLM provided no actual analysis of the significance of these emissions as either direct, indirect, or cumulative impacts. While BLM acknowledged the linear positive relationship between GHG emissions—including, significantly, emissions from burning fossil fuels—and threats to species, human health, food security, and weather conditions, BLM diminished the significance of emissions from fossil-fuel production and relied on uncertainty regarding the end use of extracted fuels to sidestep any meaningful significance analysis. Moreover, BLM's comparison of the project's estimated emissions to total California state-wide emissions as a shortcut for significance was also inconsistent with the Monument Plan, which requires BLM to manage the Monument's resources to "*minimize* the contribution to global climate change" and to evaluate the contribution of projects within the Monument to climate change. *Id.* at 30; Monument Plan, at II-34 (Objective AIR-2(P), Action AIR-2(I*)) (emphasis added).

48. BLM's revised 2020 EA also provided additional information regarding potential impacts to species. However, in the 2020 EA, BLM dismissed impacts to habitat, including habitat fragmentation, from the project's operation and concluded that "[t]he above ground pipeline proposed does not fragment habitat—it does not prevent immigration and or emigration of concerned species. And only temporarily disturbs existing habitat when installed." 2020 EA, at 32 (emphasis added). This conclusion was contrary to BLM's statement in the 2012 EA that such a pipeline

"does have the potential to fragment habitat."  2012 EA, at 17 (emphasis added). BLM did not explain its change in position.  Nor is a new above-ground pipeline a temporary disturbance; it is a long-term impact that will fragment habitat until such time as it is removed, and the area restored to its natural condition.  However, in its analysis of Alternative 3 which required a buried pipeline, BLM acknowledged that the alternative would reduce potential long-term effects to species "since a buried flowline would be less likely to fragment habitat."  2020 EA, at 39.  BLM declined to adopt Alternative 3, which would have reduced these impacts by requiring the new pipeline to be buried along an existing road.  Moreover, Alternative 3 more closely aligned with the Monument Plan's directive to manage leases and design roads, well pads, and facilities to minimize habitat fragmentation.  Monument Plan, II-73 to II-74 (Objective MNL-4(I*), Action MNL-8(I*)).

49.    The revised 2020 EA did not provide any additional information or analysis of visual resource impacts or any additional alternatives analysis despite inadequacies pointed out in Plaintiffs' comments and SDR request.

50.    Another example of BLM's failure to timely ensure abandonment and restoration of idle wells is RRU 21-25 which was also identified in the BLM's 2013 letter listing 12 wells that in the Russell Ranch Oil Field that have been idle for 25+ years. Well RRU 21-25 was initially drilled in 1949 but has never produced oil.  In 1953 it was converted to water injection and that was shut-in by 1963. The 2013 BLM letter requests that the operator indicate by April 2014 whether it will return the well to production, or plug and abandon and explains that sundry notice for "notice of intent to abandon" would need to be filed by April 1, 2014, with all work completed within one year of approval. In response, in 2013 E&B stated to BLM: "There is productive behind pipe potential above the current perforated interval. Perforate the well and return to production. If the well is uneconomic to produce, abandon the well. RTP [Return to production] in 2014."  In 2014, there was an attempted reactivation

Complaint for Declaratory and Injunctive Relief

and return to production pursuant to agreement with BLM but significant damage to well was encountered. In 2015, the well was still idle although additional work performed. In 2018, BLM announced an effort to prepare EA for "One Russell Ranch Abandonment RRU 21-25." However, in 2019, BLM indicated that the abandonment project was withdrawn. As of 2020, the current well status for RRU 21-25 remains "Idle".

51.    Of the twelve long-term idle wells in the Carrizo Plain National Monument identified by BLM in its September 2013 letter to E&B, 10 of the wells remain "Idle" with no indication of when the wells will be returned to production or plugged and abandoned.  Eight of those 10 wells have been idle for over forty years, and a ninth has been idle for 38 years.

## FIRST CLAIM FOR RELIEF

### (Violations of FLPMA, Monument Plan, and APA in Adopting New Decision Record Approving APD and Pipeline)

52.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

53.    FLPMA requires that all of BLM's management decisions involving the Monument's lands and resources conform with the Monument Plan.

54.    BLM's approval of the APD and pipeline violates the Monument Plan in myriad ways including, but not limited to, the following:

a.    BLM failed to manage existing leases to minimize habitat fragmentation and impacts to habitat, visual, and other resources by dismissing Alternative 3 in the 2020 EA, which would have required the new pipeline to be buried along an existing road.

b.    BLM failed to adequately evaluate the proposed action's contribution to climate change and the related impacts on Monument resources, and to mitigate or otherwise minimize those contributions.

18

Complaint for Declaratory and Injunctive Relief

c.   BLM's approval of the APD and pipeline was directly contrary to its prior approval of the abandonment and reclamation project to restore the very same well pad and BLM failed to provide an explanation for its change in position.

55.   For each of the above reasons, and others, BLM's approval of the APD and pipeline is arbitrary, capricious, and contrary to law under FLMPA, its implementing regulations, and the APA, and is subject to judicial review under the APA.  5 U.S.C. §§ 701-706, 706(2).

**SECOND CLAIM FOR RELIEF**

**(Violations of NEPA and APA in Adopting New Decision Record Approving APD and Pipeline; Preparation of an Unlawful EA and FONSI)**

56.   Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

57.   NEPA requires BLM to consider an adequate range of alternatives to the proposed action as part of its environmental analysis.  42 U.S.C. § 4332(2)(C)(iii). In the 2020 EA, BLM considered only three alternatives: (i) a no-action alternative, (ii) the proposed action, and (iii) an alternative that was similar to the proposed action, but required the existing oil-production flowline to be buried in the existing roadway if it did not pass hydrostatic testing.  2020 EA, at 7-8.  The EA, however, failed to consider any additional alternatives, including lease termination of this long-idle lease as anticipated in the Monument Plan, and did not provide any explanation regarding why it declined to consider such additional alternatives.  BLM's failure to evaluate an adequate range of alternatives violated NEPA and was arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

58.   Under NEPA, BLM must take a "hard look" at the proposed action's consequences, environmental impacts, and adverse effects.  42 U.S.C. § 4332(2)(C), (E); 40 C.F.R. § 1508.9.  BLM failed to take a hard look at the proposed action's impacts on the Monument's visual and aesthetic resources.  BLM arbitrarily assumed

19

Complaint for Declaratory and Injunctive Relief

in the 2020 EA that the project "would be visible for a few seconds at nearly a 90 degree angle from [Highway] 166," and that the project "would not be visible from either the Caliente Mountain Rd . . . or from the Caliente Mountain Wilderness Study Area" and, on that basis, concluded that the addition of one new well in the Russell Ranch Oil Field "would not be expected to result in impacts to visual resources." 2020 EA, at 25-26, 70.  Plaintiffs prepared and provided to the State Director a 3-D visual GIS analysis and a map, which illustrated that, contrary to BLM's conclusion, the project would be visible from the following areas: (i) 379.80 feet along the Caliente Ridge Trail, (ii) 648.94 acres in the Caliente Mountain Wilderness Study Area, (iii) 757.31 acres in the Monument, (iv) 7048.64 acres in the Los Padres National Forest, and (v) 1.69 miles along Highway 166.  BLM's failure to consider these additional observation points and to identify and analyze mitigation alternatives to minimize the project's visual impacts violated NEPA, and was arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

59.    BLM failed to take a hard look at the proposed action's impacts on rare plants and threatened, endangered, and sensitive species and their habitats, including impacts to the San Joaquin kit fox, the California condor, the blunt-nosed leopard lizard, the giant kangaroo rat, the San Joaquin antelope squirrel, the longhorn fairy shrimp, and the vernal pool fairy shrimp, among others.  Specifically, BLM failed to take a hard look at impacts to species and their habitats resulting from oil spills, microtrash, and other attractive nuisances created by oil-and-gas operations.

60.    BLM failed to take a hard look at the air-quality and climate-change impacts of oil-and-gas extraction, including from direct and indirect GHG emissions. BLM failed to analyze the cumulative impacts of the project's GHG emissions, despite available methods of doing so, and arbitrarily concluded that its analysis of indirect GHG emissions was a "proxy for assessing potential for climate change

Complaint for Declaratory and Injunctive Relief

effects and climate related cumulative impacts." 2020 EA at 30. BLM relied on vague generalizations to minimize and dismiss the significance of the project's GHG contributions by equating the proposed project's annual direct and indirect emissions with "operating 13 semi-trucks 5 days a week for a year." *Id.* BLM should have considered the significance of the project's impacts on climate change, including GHG emissions generated by the project and by the addition of more fossil fuels into the economy, in the context of the Monument Plan as well as the need to reduce GHG emissions to meet California's climate goals, but did not.

61. For each of the above reasons, BLM's adoption of an inadequate EA and FONSI to support its approval of the APD and pipeline is arbitrary, capricious, and contrary to law under NEPA, its implementing regulations, and the APA, and is subject to judicial review under the APA. 5 U.S.C. §§ 701-706, 706(2).

## THIRD CLAIM FOR RELIEF

### (Violation of NEPA and APA; Failure to Prepare an EIS)

62. Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

63. BLM violated NEPA in approving the APD and pipeline without preparing an EIS. NEPA requires BLM to prepare an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. BLM's Decision Record approving the APD and pipeline is a major federal action significantly affecting the quality of the human environment. BLM's conclusion that preparation of an EIS was not necessary before approving the proposed action was arbitrary, capricious, and contrary to law.

64. NEPA's implementing regulations list ten factors that BLM must consider in determining the significance of a proposed action's environmental effects. 40 C.F.R. § 1508.27. Several factors requiring the preparation of an EIS are triggered by BLM's APD and pipeline approval. Among others, the proposed action affects the

Complaint for Declaratory and Injunctive Relief

Monument's "[u]nique characteristics . . . such as proximity to historical or cultural resources" and "ecologically critical areas," and is "highly controversial" as established in Plaintiffs' comment letters throughout the permitting process. *Id.* § 1508.27(b)(3), (4).  In addition, BLM's approval of the first new APD and pipeline since the Monument was designated "may establish a precedent for future actions with significant effects" as other parties seek permits to drill on existing leases within the Monument, and would thereby exacerbate cumulative impacts on the environment. *Id.* § 1508.27(b)(6), (7).  Finally, the proposed action may have adverse effects on endangered or threatened species and their habitat, and it threatens compliance with the Endangered Species Act.  *Id.* § 1508.27(b)(9), (10).  The presence of any one of these factors renders BLM's decision not to prepare an EIS arbitrary, capricious, and contrary to law.

65.    For each of the above reasons, BLM's approval of the APD and pipeline without preparing an EIS is arbitrary, capricious, and contrary to law under NEPA, its implementing regulations, and the APA, and is subject to judicial review under the APA.  5 U.S.C. §§ 701-706, 706(2).

**FOURTH CLAIM FOR RELIEF**

**(Violations of FLPMA, Monument Plan, and APA; Failure to Ensure Idle Wells Are Properly Plugged, Abandoned, and Reclaimed)**

66.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

67.    FLPMA requires that BLM's management decisions conform with the Monument's resource management plan.  BLM violated the Monument Plan by failing to ensure timely plugging, abandonment, and reclamation of E&B's 12 idle wells as the Monument Plan requires.  *See* Monument Plan, at II-73 to II-75 (Actions MNL-3(S), MNL-6(I*), MNL-10(I*), MNL 20(S)).

Complaint for Declaratory and Injunctive Relief

68.     The APA provides relief for an agency's failure to act by authorizing a reviewing court to "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). An agency's failure to act is reviewable when the agency failed to take a discrete agency action that it is legally required to take. For example, for over 7 years, BLM failed to ensure that E&B abandoned, reclaimed, and restored to natural conditions the twelve (12) idle wells identified by BLM in 2013, the related infrastructure, and the surrounding land. BLM's unreasonable delay and failure to act to ensure that idle wells are plugged, abandoned and restored in a timely manner and that idle leases on the Monument are terminated are discrete and legally required actions unlawfully withheld because the Monument Plan mandates that BLM manage existing leases to ensure that idle wells are plugged, abandoned, and restored in a timely manner and idle leases are terminated.

69.     For each of the above reasons, BLM's failure to take any action to abandon and restore the idle wells is arbitrary, capricious, and contrary to law under FLMPA, its implementing regulations, and the APA, and is subject to judicial review under the APA. 5 U.S.C. §§ 701-706, 706(1).

## REQUEST FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

A.      Find and declare that BLM violated FLPMA by failing to comply with the Monument Plan and the APA by approving the APD and pipeline;

B.      Find and declare that BLM violated the NEPA and the APA by approving the APD and pipeline without adequate environmental review;

C.      Find and declare that BLM violated the APA by failing to ensure that the RRU 77-23 well and associated facilities were timely abandoned and reclaimed, and by approving a project inconsistent with the BLM's abandonment and reclamation plan for this area;

D.      Vacate and set aside the 2020 Decision Record and FONSI;

Complaint for Declaratory and Injunctive Relief

E.    Find and declare that BLM has violated the APA and the Monument Plan by failing to ensure that idle wells on the Monument, including but not limited to eleven (11) of the twelve (12) wells identified by BLM in 2013, are timely abandoned and reclaimed and idle leases on the Monument are terminated;

F.    Award plaintiffs their costs of litigation, including reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

G.    Grant plaintiffs such additional relief as the Court may deem proper.

Respectfully submitted,

Dated: December 15, 2020          /s/ Lisa T. Belenky

Lisa T. Belenky (CA Bar No. 203225)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, California 94612
T:    (510) 844-7107
F:    (510) 844-7150
lbelenky@biologicaldiversity.org

Deborah A. Sivas (CA Bar No. 135446)
Matthew J. Sanders (CA Bar No. 222757)
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305-8610
T:    (650) 723-0325
F:    (650) 723-4426
dsivas@stanford.edu
matthewjsanders@stanford.edu

*Attorneys for Plaintiffs*

Complaint for Declaratory and Injunctive Relief